George C. KELL, Jr., et ux *v.* BELLA VISTA VILLAGE PROPERTY OWNERS ASSOCIATION

75-143                                                            528 S.W. 2d 651

Opinion delivered October 27, 1975

*Ralph C. Williams*, for appellants.

*Little, Lawrence, McCollum & Mixon* and *Smith, Williams, Friday, Eldredge & Clark*, for appellee.

CONLEY BYRD, Justice. This litigation arises out of the covenant assessments contained in the bill of assurance of a planned community development for the maintenance and operation of specified common properties developed for the use and benefit of all property owners in the platted area. The litigants are the appellants, George C. Kell, Jr. and Sharon A. Kell, his wife, property owners, and the appellee, Bella Vista Village Property Owners Association, a non profit corporation organized to act as trustee for the property owners. The matter was submitted to the trial court upon the pleadings and the testimony of John A. Cooper, Jr. and James A. Hatcher. The trial court held the assessments valid and secured by a continuing lien upon the land. Based upon that holding the trial court entered a judgment foreclosing the delinquent and unpaid assessments in favor of appellee. For reversal, the appellants raise the issues hereinafter discussed.

POINT 1. Appellants here contend that since the property constituted their homestead under Article 9, § 3 of the Constitution of Arkansas, their property is not subject to the lien of the assessments. The particular section of the declaration in the bill of assurance, which is challenged, provides:

"... The annual and special assessments, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the property against which each such assessment is made."

The foregoing language is equally as strong and specific

as a mortgage provision extending the lien thereof to future advances, and we can see no reason why the language employed should not be considered as creating a continuing lien on the property for future assessments.

POINT 2. The appellants here argue that they are not bound to pay the annual assessments because the covenant does not run with the land. We find no merit in this contention. See *Neponsit Property Owners' Ass'n* v. *Emigrant Industrial Sav. Bank,* 278 N.Y. 248, 15 N.E. 2d 793, 118 ALR 973 (1938). Furthermore, the proof here shows that the common properties to be maintained add a value to each lot or living unit subject to the covenants.

POINT 3. Even though the record shows that the lien created by the bill of assurance was recorded, the appellants argue that they are not bound by the lien created thereby because they were not orally advised that such a lien existed. We find no merit to this contention. See Ark. Stat. Ann. § 16-114 (Repl. 1968), which makes the recording of such instruments constructive notice to all persons.

POINT 4. Appellants contend that the covenant constitutes a perpetuity contrary to Article 2, § 19 of the Constitution of Arkansas. The bill of assurance provides that the assessment covenant will remain outstanding for a term of 26 years and for successive ten year periods thereafter, until an instrument is signed and recorded by the then owners of two thirds of the lots or living units. We find no merit to this contention. See *Lowry* v. *Norris Lake Shores Development Corporation,* 231 Ga. 549, 203 S.E. 2d 171 (1974). There is nothing here which keeps the property from vesting.

POINT 5. Under Article III, Section 2 of the declaration in the bill of assurance, the developer is classified as the only Class "B" member of the property owners association, and as such, it is entitled to ten votes for each lot or living unit of which it is the record owner. However, insofar as any action to increase the annual assessments is concerned, the Class "B" member only has a veto over such assessments, and its votes are not counted against the Class "A" members, such as appellants. Such class distinctions are ordinarily up-

held among corporate shareholders, and in the absence of authority to the contrary, we can see no reason why such a veto power over increased assessments should be prohibited in matters involving private contract rights.

POINT 6. The allegation that the assessments amount to an unlawful delegation to tax in violation of Article 2, § 23 of the Constitution of Arkansas overlooks the fact that the assessments here arise out of contract and that they constitute a benefit to the property owner. Other courts recognize that such assessments are not an unlawful delegation of the State's taxing power, *Henlopen Acres* v. *Potter,* 36 Del. Ch. 141, 127 A. 2d 476 (1956).

POINT 7. Appellants contend that the purposes for which the assessments are made are so vague and indefinite that they amount to a restraint on alienation. The "Covenant for Maintenance Assessments" insofaras here applicable provides:

## "ARTICLE X
### Covenant For Maintenance Assessments

*Section 1. Creation of Lien.* The Developer for each Lot and Living Unit owned by it within The Properties hereby covenants and each Owner of any Lot or Living Unit by acceptance of a deed therefor, or by entering into a contract of purchase with the Developer, whether or not it shall be so expressed in any such deed, contract of purchase, or other conveyance, shall be deemed to covenant and agree to pay to the Club: (1) annual assessments of charges; (2) special assessments for capital improvements, such assessments to be fixed, established and collected from time to time as hereinafter provided. The annual and special assessments, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the property against which each such assessment is made.

*Section 2. Purpose of Assessments.* The assessments levied hereunder by the Club shall be used exclusively

for the purpose of promoting the recreation, health, safety, and welfare of the residents in The Properties and in particular for the improvement and maintenance of properties, services and facilities devoted to this purpose and related to the use and enjoyment of the Common Properties and the improvements situated upon The Properties, including, but not limited to, the payment of taxes and insurance thereon, and repair, replacement, and additions thereto, and for the cost of labor, equipment, materials, management and supervision thereof. The limitation aforesaid shall not preclude the use of assessments levied hereunder for maintenance of roads and streets within The Properties, even though same have been dedicated to the public.

*Section 3. Basis and Maximum of Annual Assessments.* Until the year beginning January, 1970, the annual assessment shall be $60.00 per Lot or Living Unit. From and after January 1, 1970, the annual assessment may be increased by vote of the members, as hereinafter provided, for the next succeeding three years and at the end of each such period of three years for each succeeding period of three years. Unless the annual assessment shall be increased as aforesaid, it shall remain at $60.00 per Lot or Living Unit.

The Board of Directors of the Club may, after consideration of current maintenance costs and future needs of the Club, fix the actual assessment for any year at a lesser amount. Likewise, the Board of Directors of the Club may, after consideration of the lack of improvements as to lots in a certain area, fix the actual assessment for any year as to these particular lots at a lesser amount.

*Section 4. Special Assessments for Capital Improvements.* In addition to the annual assessments authorized by Section 3 hereof the Club may levy in any assessment year a special assessment, applicable to that year only, for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, unexpected repair or replacement of the roads and streets within The Properties, even though same may have been

dedicated to the public, and also a described capital improvement upon the Common Properties, including the necessary fixtures and personal property related thereto, provided that any such assessment shall have the assent of 51% of the votes of each class of members who are voting in person or by proxy at a meeting duly called for this purpose, written notice of which shall be sent to all Members at least 30 days in advance and shall set forth the purpose of the meeting. The Board of Directors of the Club may, after consideration of lack of improvements as to lots in a certain area, fix the assessment for any year as to these particular lots at a lesser amount.

*Section 5. Change in Basis of Maximum of Annual Assessments.* Subject to the limitations of Section 3 hereof, and for the purpose therein specified, the Club may change the maximum and basis of the assessments fixed by Section 3 hereof prospectively for any such period provided that any such change shall have the assent of 51% of the votes of each Class of Members who are voting in person or by proxy, at a meeting duly called for this purpose, written notice of which shall be sent to all Members at least 30 days in advance and shall set forth the purpose of the meeting."

As we read the foregoing provisions, the annual assessments are levied for the purposes of improvement and maintenance of the properties held for the joint use of the properties which include "the payment of taxes and insurance thereon, and repair, replacement, and additions thereto, and for the cost of labor, equipment, materials, management and supervision thereof." Of course, for these purposes the appellee acts as a trustee for the use and benefit of the property owners. In such capacity it has some discretion as to expenditures, but under those circumstances, a property owner would have recourse in a court of equity to prevent any arbitrary or capricious action on the part of appellee. By virtue of this recourse in equity for relief, the covenants contain a formula from which assessments can be determined, and for these purposes, the assessments are not vague and indefinite and do not constitute a restraint on alienation.

The courts that have considered such assessments have upheld them where the purpose of the assessments has been stated so that a formula for the calculation of the amount thereof can be determined. See *Rodruck v. Sand Point Maintenance Commission,* 48 Wash. 2d 565, 295 P. 2d 714 (1956). Likewise, such assessments have been struck down as a restraint upon alienation where the covenants do not contain a formula for the calculation of the amount of the assessment. See *Peterson v. Beekmere, Incorporated,* 117 N.J. Super. 155, 283 A. 2d 911 (1971), and the cases from other jurisdictions cited therein. The courts that have considered the matter of assessment covenants have also refused to enforce such covenants when they do not apply alike to all units in the same subdivision enjoying the benefits to the common properties, *Peterson v. Beekmere, Incorporated, supra.* The reason is that the property bound by such covenants would be forced to tender larger proportionate amounts through assessments although such non-contributing neighbors would enjoy the same benefits.

When we consider the foregoing authorities, the term "a described capital improvement" in Article X, § 4 requires some discussion. If it is construed to mean the erection of any future improvement that the majority desire (such as an astrodome), then it clearly would amount to a restraint on alienation and would be void. However, the term "a described capital improvement" can be construed to mean those improvements described by the covenants and necessarily contemplated in the use or enjoyment thereof, such as an additional water tower to supply sufficient water pressure for domestic use and fire protection for some or all of the property owners. Applying the latter usage, the term "a described capital improvement" would furnish a sufficient formula for the calculation of the amount of the special assessment and would not constitute a restraint on alienation. Since, in the interpretation of contracts, we are to give a written contract, susceptible to more than one interpretation, a construction that will make it valid, it follows that when the term "a described capital improvement" is given the latter interpretation, we must uphold this Article X, § 4 provision as being valid and binding.

The provisions in Sections 3 and 4 of Article X, *supra,* providing that appellee "... may, after consideration of the lack of improvements as to lots in a certain area, fix the actual assessment for any year as to these particular lots at a lesser amount" appears to be invalid since the owners thereof have the same privilege of using the common facilities as do any of the residents of improved lots.

The foregoing invalid provisions can easily be separated from the valid provisions. Since the bill of assurance contains a severability clause and since the assessments here are not affected by the invalid provisions, we find that it does not impair or otherwise invalidate the annual assessments for maintenance and repair.

POINT 8. The contention of appellants that the property owners' association has no standing to enforce the covenant to pay annual assessments is without merit. See *.Veponsit Property Owners' Ass'n* v. *Emigrant Industrial Sav. Bank, supra.*

Affirmed as modified.

Roy, J., not participating.