The Honorable Chaney Taylor, Jr. State Representative P.O. Box 2721 Batesville, AR 72803-2721
Dear Representative Taylor:
I am writing in response to your request for my opinion regarding various issues raised by Fairfield Bay City Attorney John Shamburger. You have provided the following factual background:
 1. Fairfield Bay (FFB), a planned Community Development, is the product of a private company, Fairfield Communities, Inc. (FCI). FCI began in the 1970s to sell residential lots and build the actual community.
 2. FCI, which built limited sewer facilities with its own funds, was able in 1978 to prevail upon Van Buren County to establish the "Van Buren County, Arkansas Public Facilities Board (Fairfield Bay)["], hereinafter referred to as "County Facilities Board (which was created by VB County Ordinance No. 78-9) sold bonds and received the funds. The County Facilities Board (CFB) and FFB Community Club, Inc. (FFBCC) and FCI negotiated a contract to purchase the system and operate it. Over the ensuing years more sewer plant facilities were built, four (4) by the Facilities Board (which was managed by the Community Club) and two (2) by the Community Club itself, for a total of six (6) separate operating sewer system plants now serving the city of Fairfield Bay.
 3. The FFBCC is a non-profit property owners association charged with managing and providing amenities pursuant to the comprehensive Covenants and Restrictions in the original plats and Bill of Assurance adopted by the developer before any lots were sold. It acts in some instances as [sic] a quasi-governmental capacity, under the aforementioned Covenants Restrictions and Bill of Assurance filed by the developer under A.C.A. § 18-12-103. See Kell vs. Bella Vista Village, 258 Ark. 757, 528 SW2d 651 (1975).
 4. In 1993 the citizens of FFB voted to incorporate and became a second class city. The city's income sources are turn-back funds from the State, County, and a City Sales and Use Tax which was passed last November. The City does not levy an ad valorem property tax. The City Dept. of Public Safety is partially subsidized by the FFBCC for an agreed upon fee and the FFBCC assists in street maintenance. The City does not have any financial interest in or control of the sewer system and no controls by the City have been proposed by the FFBCC as Manager or by the CFB. The FFBCC and the CFB have both requested that the City pass an ordinance which would require property owners to hook up to the sewer system of the CFB if it is within 300 feet of their property. Mr. Shamburger listed the following legal authorities:
 a. County Facilities Boards are authorized for counties (and City Public Facility Boards for Cities) by Act 142 of 1975, codified at A.C.A. § 14-131-101 et seq. A.C.A. § 14-137-108 as amended refers to and contemplates and allows inter local agreements which extend jurisdiction beyond that of the creating governmental unit. At present, FFB has no inter local compact or agreement. The language of the Van Buren County Ordinance, recitals and body of the ordinance contemplates and authorizes countywide jurisdiction and beyond by inter local agreements.
 b. A.C.A. § 14-235-203, 204 205 deal with authority of municipalities. This authority specifically refers to Municipal Sewage Systems — not State, County or sewer systems of other governmental units. State Health Department powers are specifically declared "unaffected" by municipal action (A.C.A. § 14-235-204).
 c. Second class cities have little or limited "home rule" and as creatures of the State are empowered to act only when authorized by statute. See Bennet v. City of Hope, 204 Ark. 147, 161 SW2d 186 (1942) and Arkansas Constitution, Article 12, sections 3 and 4. The private septic systems in FFB were authorized and permitted by the State Health Dept., acting under state law (A.C.A. § 14-236-112). A large number of existing individual septic systems were permitted by the State Health Department after the CFB commenced operating. There have been few private septic systems that had problems but the City, under its police power and with the cooperation of the State Health Dept. and the FFBCC, has been able to eliminate such individuals' problems, under existing state law.
 FFB is now scattered over 12,000 acres and is not having any real problems but recognizes there could be and probably will be problems as the population increases and becomes more dense. FFB also recognizes that the financing of extensions and building of new treatment plants and laying new lines without mandatory hook-up will be very difficult. A.C.A. 14-235 sections 301-305 relate only to city sewage systems created under chapter 235 and the city is empowered to require hook-up to a "Municipal Sewer System", but is silent or withholds any grant of authority to require its property owners to hook-up to other systems. (Improvement Districts, Facilities Boards).
 d. A.C.A. § 14-236-101—118 (Arkansas Sewage Disposal Systems Act) sets out exemptions for individual sewage septic systems approved or authorized under state law and permitted by the Arkansas Health Department. That statute also gives the State Health Dept. authority in the case of a nuisance or health hazard to require conformance to this Chapter. The Arkansas Health Department declines to become in jurisdiction [sic] of lower governmental units unless there is a nuisance or health hazard.
 e. A.C.A. § 14-236-106 [sic: A.C.A. § 14-236-105] provides that a municipal law shall prevail (over other law) within the jurisdiction of the city when it requires greater protection to the public health, such as purer effluent, less solids. This appears to be the only grant of city authority over other systems.
 f. A.C.A. § 14-236-109 provides that property owners associations (e.g. FFBCC) that have built facilities in compliance with state law shall have supervision and authority over construction and operation etc. of individual and community sewage disposal systems for the area over which their authority extends.
 g. A.C.A. § 14-236-107 gives the Health Dept. control, authority and responsibility to enforce the Arkansas Sewage Disposal Systems Act. State law provides for creation of and relates to other entities and their sewage systems in A.C.A. § 14-92-219 (Suburban Improvement Districts); A.C.A. § 14-88-202 (Municipal Improvement Districts); and A.C.A. § 14-250-101 (Wastewater Treatment Districts).
 h. Finally, A.C.A. § 14-236-112 gives the State ultimate control and requires a State permit after July 1, 1977 by any person, firm, association, municipality or governmental agency that wants to construct, alter, repair, extend or operate a sewage system.
 According to Mr. Shamburger, there seems to be little if any doubt that sewers, sewer treatment plants and lines including the construction, regulation and control thereof are valid and proper subjects for the exercise of "police powers" to protect the health of the public. The question here is which governmental unit or agency has authority or in the event of overlapping authority which should exercise authority under the police power to protect the public health.
 The State through the Health Dept. and its designated representative (A.C.A. § 14-236-103) has been and is directly involved in percolation tests and issuing permits for individual septic systems in FFB. The legislature has mandated in A.C.A. § 14-236-107 a comprehensive regulatory scheme by the Health Dept., and charged it with the duty to administer and adopt regulations.
 The VB County Public Facilities Board by A.C.A. 14-137 §§ 101-103 is empowered to act in the construction and operation of a sewage system to issue bonds. A.C.A. § 14-137-104(c) provides that none of the powers of the Facilities Board ". . . . shall be subject to the supervision or regulation or require consent of the State or any municipality . . ."
The State Sewage Disposal Systems Act was a 1977 Act and should control over the 1975 State Act creating Facilities Boards. Fairfield Communities, Inc. built the first treatment plant and the sewer system was then sold to the County Facilities board (managed by the Community Club) a property owners association under A.C.A. § 14-236-109 and paid for with funds from a bond issue. The Facilities Board built several other treatment plants and enlarged the system.
 According to Mr. Shamburger, chaos could and would probably result from conflicting regulation, control and enforcement by the State, County Facilities Board, Property Owners Association (now manager of the system) and the City of FFB. No clear "pecking order" or division of authority among the different governmental units is set forth by statute or case law and the City has taken the position that its authority under 14-236-105 is limited to establishing standards which afford greater protection or safety (such as requiring the effluent to be purer or have less suspended solids). The city believes it should, for lack of clear authority, withhold any action and decline to exercise any police power it may have with all the conflicting legal questions and concepts and different governmental units. The "pecking order" should be clarified and in case of conflicting authority reconciled. The matter could become even more complex because the effluent is discharged into Greers Ferry Lake — over which the U.S. Corps of Engineers has jurisdiction.
Against this backdrop, you have posed the following questions:
 1. Which agency or governmental unit has the authority to require property owners of homes and buildings to "hook-up" to the public sewer system when its lines are within 300 feet of the property? If the answer is more than one entity, then please advise which agency should take such action. Does the Health Department now have authority to act or direct the proper entity to act?
 2. Since the Community Club owns two (2) of the six (6) sewage treatment plants and the lines served by those plants, should those lines and treatment plants be in the same position and governed by the same law that governs the plants and lines of the County Facilities Board? (The Community Club acts as Manager of County Facilities Board System and apparently is acting for itself on two plants and lines.)
 3. Are the meetings of the County Facilities Board subject to the Arkansas Freedom of Information Act?
 4. Are the meetings of the Community Club, acting as manager of the County Facilities Board and for themselves, subject to the Arkansas Freedom of Information Act?
RESPONSE
With respect to your first question, nothing in the Public Facilities Boards Act of 1975, A.C.A. § 14-137-102 et seq., authorizes a facilities board to mandate hooking up to a community sewer system. Moreover, nothing in the Code expressly authorizes a county to mandate sewer hookup. Although A.C.A. § 14-14-708 does authorize the formation of a subordinate sewer service district following notice and a public hearing, only county services are covered. A facilities board is an autonomous entity not subject to county control, A.C.A. §§ 14-137-104(b) and (c), and nothing authorizes the county to mandate hookup to a private property owners' association's sewer lines. Although A.C.A. §14-235-302(a) authorizes a city to mandate hooking up to a sewer line, the city can do so only for property within 300 feet of the line, A.C.A. § 14-235-304, and only to a municipal line. With respect to the Fairfield Bay Community Club, a property owners' association's charter documents will control whether it can direct its members to tie into its lines. With respect to potential state regulation, although the Division of Sanitarian Services of the Department of Health regulates community sewage systems in unincorporated areas and individual sewage systems throughout the state, see Arkansas Sewage Disposal Systems Act, A.C.A. §14-236-101 et seq., I believe the state would be authorized to mandate sewer hookups throughout Fairfield Bay only if doing so were "necessary and reasonable . . . for the protection of the public health and safety." A.C.A. § 20-7-109(a)(1). Finally, although this office avoids opining on matters of federal law, even assuming that the Corps of Engineers has preemptive power to enforce federal standards regarding effluents into Greer's Ferry Lake, I strongly doubt that the Corps can mandate that residents tie into a particular sewage system. Local counsel should consult with federal officials on this issue. The city and county might contemplate forming a wastewater treatment district pursuant to A.C.A. §14-250-102, et seq., enabling them to contract for services with the owners of the sewer systems and to impose mandatory service fees on residents. Fifty-one percent of property owners in unincorporated areas would have to approve the formation of such a district. A.C.A. §14-250-106(b). Again, this is a decision for local counsel and officials.
With respect to your second question, although the facilities owned by the Community Club and Facilities Board are generally subject to governmental environmental and health regulations, the question of what requirements these entities can impose on Fairfield Bay residents can only be answered by reviewing the organization's charter documents and any pertinent contractual commitments. With respect to your third question, I believe the meetings of the Facilities Board must clearly be open pursuant to the Arkansas Freedom of Information Act. With respect to your final question, I believe meetings of the Community Club acting as "manager" of the Facilities Board must be open if the Community Club's management activities are publicly funded, are intertwined with the Facilities Board's public function and involve the exercise of decision-making authority normally associated with a "governing body." A.C.A. § 25-19-106(a). With respect to the Community Club's other meetings, these must likewise be open if they deal with publicly funded activities serving some public purpose intertwined with that of government. A.C.A. § 25-19-106(a). Only a finder of fact can make these determinations.
Question 1: Which agency or governmental unit has the authority torequire property owners of homes and building to "hook-up" to the publicsewer system when its lines are within 300 feet of the property? If theanswer is more than one entity, then please advise which agency shouldtake such action. Does the Health Department now have authority to act ordirect the proper entity to act?
I should note at the outset that, despite your lengthy recital of facts, it remains unclear to me precisely what relationship exists among the various entities mentioned in your request. You indicate that Fairfield Communities, Inc. ("FCI") as developer initially constructed some "limited sewer facilities," which it eventually conveyed pursuant to a contract between it, the Van Buren County Facilities Board (the "Facilities Board") and a private nonprofit property owners' association called the Fairfield Bay Community Club, Inc. (the "Community Club"). You further indicate that the purpose of this contract was "to purchase the system and to operate it." You later indicate that the Facilities Board alone purchased the first treatment plant and sewer system. I cannot determine from your request under what circumstances FCI sold the system and what conditions the contract dictated regarding its operation. Moreover, it is unclear whether the contract contained any provisions regarding sewer system plants to be constructed at Fairfield Bay in the future. In addition, although you suggest that the Community Club may have some ongoing sewage management obligation "pursuant to the comprehensive Covenants and Restrictions in the original plats and Bill of Assurance adopted by the developer before any lots were sold," I have not been provided any of these documents and am consequently unable to opine regarding what obligations they might impose or how they relate to the above referenced contract. Furthermore, although you indicate that the Community Club "manages" the Facilities Board, I am unaware by what authority it does so, particularly in light of the fact that by statute the facilities board itself is charged with managing the public facilities project. A.C.A. § 14-137-106 (Repl. 1998). I have further not been provided a copy of the ordinance creating the Facilities Board and am consequently unable to determine whether the quorum court in any wise restricted the geographical or substantive scope of what would otherwise be the Facilities Board's statutory authority. See A.C.A. §14-137-107(a)(2)(B) (authorizing the "governing body" in the creating ordinance to "place specific limitations on the exercise of the powers granted"). Finally, it is unclear from your request whether the incorporated City of Fairfield Bay includes the entire area of the Fairfield Bay community — a question whose significance should become apparent in the ensuing discussion.
The above factual considerations are ones I am neither equipped nor authorized to address, and they should be considered by local counsel for the parties, who are far better situated to determine how they bear on your question. However, I can and will set forth the general principles of law that define the authority of the various parties with respect to the management of sewage systems.
 The Facilities Board
The Public Facilities Boards Act of 1975, A.C.A. § 14-137-102 et seq.,
provides for the creations of boards to undertake a variety of public facilities projects, including the construction and extension of sewers. A.C.A. § 14-137-102(a)(6). The Facilities Board at issue in your request was apparently created pursuant to this legislation. In Ark. Op. Att'y Gen. No. 97-019, my immediate predecessor summarized the scope of the Public Facilities Boards Act as follows:
 The general purpose of the Public Facilities Boards Act is to provide an alternative method of financing public facilities. A.C.A. § 14-137-102 (1987). Arkansas Code Annotated § 14-137-106 (Supp. 1995) authorizes a municipality to create one or more public facilities boards, and A.C.A. § 14-137-107 (1987) provides that each public facilities board shall be created by ordinance of the governing body. Governing body, as used in the Public Facilities Boards Act, means the council or other like body in which the legislative functions of a municipality [or county] are vested. A.C.A. § 14-137-103(5) (Supp. 1995). The public facilities board is a public instrumentality of the municipality [or county] that created the board. A.C.A. § 14-137-114
(1987). The governing body that creates the board must specify in the enacting ordinance the powers granted to the board, and the governing body may place specific limitations on the exercise of the powers granted to the board. A.C.A. § 14-137-107 (1987). Also, the public facilities board must submit an annual report to the governing body. A.C.A. § 14-137-123 (1987). Nevertheless, except as otherwise expressly provided in the Public Facilities Boards Act, none of the powers granted to a board under the provisions of the act shall be subject to the supervision or regulation of any municipality [or county]. A.C.A. § 14-137-104 (1987). Each public facilities board is authorized and empowered "[t]o have perpetual succession as a body politic and corporate and to adopt bylaws for the regulation of its affairs and the conduct of its business." A.C.A. § 14-137-111(a)(1) (Supp. 1995). Finally, the Public Facilities Boards Act does not contain any provision regarding the dissolution or abolition of a public facilities board.[1]
The qualified autonomy of facilities boards referenced in this passage arises from A.C.A. § 14-137-104, which provides in pertinent part:
* * *
 (b) The construction of facilities for public facilities projects by or on behalf of a public facilities board under the provisions of this chapter need not comply with the requirements of any other law applicable to the construction of public works or facilities.
 (c) Notwithstanding any other provisions of state law or ordinance of any municipality or county to the contrary, except as otherwise expressly provided in this chapter, none of the powers granted to a board under the provisions of this chapter shall be subject to the supervision or regulation or require the approval or consent of the state, or of any municipality, county, or political subdivision of the state, or of any commission, board, body, bureau, official, or agency of the state or any municipality, county, or political subdivision.
In considering this statutory language, the Arkansas Supreme Court has held:
 [W]e conclude that the General Assembly has mandated independence between the facilities boards and the counties. This statutory separation is consistent with other provisions of the Public Facilities Board Act. See, e.g., Ark. Code Ann. § 14-137-120(a) (Supp. 1995) (bonds issued by a public facilities board do not obligate the faith and credit of the creating municipality or county); Ark. Code Ann. § 14-137-106(a)(2) (Supp. 1995) (public facilities boards are not administrative boards under the County Government Code).
Sanders v. Bradley County Human Services Public Facilities Board,330 Ark. 675, 681-82, 956 S.W.2d 187 (1997).
However, although an existing facilities board can act autonomously within the scope of its powers, it does not necessarily follow that it can act exclusively within its designated geographical range. As one of my predecessors noted in Ark. Op. Att'y Gen. No. 92-337:
 [N]othing in A.C.A. 14-137-101—123 gives a public facilities board exclusive authority to provide the services in question. Whether another utility is precluded from providing services to the area, however, may depend upon several factors other than the mere creation of the public facilities board, including any relevant ordinances as to exclusivity, any exercise by the county of the power of condemnation in favor of the board (see A.C.A. 14-137-112 (Cum. Supp. 1991)), and the implementation and legality of such actions. The resolution of the ultimate question of exclusivity of services will thus involve myriad factual issues which this office is not in a position to determine. The advice and counsel of the county attorney on this point would therefore be indicated.
More directly to the point of your question, despite the qualified autonomy of the Facilities Board, nothing in the Public Facilities Board Act authorizes a facilities board to mandate that residents tie into a sewer system. Accordingly, my immediate predecessor has opined that a county "may not use a `public facilities board' to provide mandatory sewer service." Ark. Op. Att'y Gen. No. 95-044. I fully concur in this conclusion.
 The County
As my predecessor noted in Opinion 95-044, the Code likewise contains no provision expressly authorizing a county to mandate hookup to a sewer system. However, my predecessor did point out that the county might effect mandatory service through the formation of a "subordinate service district":
 A county is authorized, however, under A.C.A. § 14-14-708, to create a "subordinate service district" to provide" water, sewer, and other utility services, including sanitary and storm sewers and sewage treatment services. . . ." Counties are authorized under this law to levy service charges to provide and finance this service. See A.C.A. § 14-14-708(d). Additionally, the service charges" shall be entered on tax notices to be collected with the real and personal property taxes of the county." A.C.A. § 14-14-711(d).
The referenced legislation requires notice and a public hearing prior to the quorum court's adoption of an ordinance creating the district, as well as an opportunity for 50% of the electors to void the ordinance by protesting in writing. A.C.A. §§ 14-14-709 and -710. See Arkansas Countyv. Burris, 308 Ark. 490, 825 S.W.2d 590 (1992); Freeman v. Curry,299 Ark. 263, 772 S.W.2d 586 (1989).
However, I question whether the formation of such a district would support mandating hookup to the particular sewage facilities described in your request. Subsection 14-14-708(c) of the Code defines a "subordinate service district" as "a county service organization established to provide one (1) or more county services or additions to county services and financed from revenues secured from within the designated service area through the levy and collection of service charges." (Emphasis added.) As this definition reflects, the focus of a subordinate service district is the provision of county services. Although this definition might include the activities of the Facilities Board, which, as noted above, constitutes a "public instrumentality of the . . . county," A.C.A. § 14-137-114, it remains the case that the Facilities Board is an autonomous "body politic and corporate," A.C.A. § 14-137-111(a)(1), that owns its own facilities[2] and that is not subject to county regulation or supervision. A.C.A. §§ 14-137-104(b) and (c).[3] Moreover, I do not believe this definition could apply to services provided by a private entity like the Community Club.
 The City
The law with respect to municipal sewage systems is set forth at A.C.A. § 14-235-201 et seq. (Repl. 1998 Supp. 2001). Subsection14-235-203(c)(1) of the Code provides that every municipality may "own, acquire, construct, equip, operate, and maintain" a sewer system "within or without the corporate limits of the city or town." Subsection14-235-203(c)(1) affords all municipalities jurisdiction up to ten miles outside their corporate limits. Subsection 14-235-204(a) confirms this authority and further authorizes the issuance of bonds to finance sewer construction. Subsection 14-235-204(b) conditions this grant of authority by providing that "all functions, powers, and duties of the State Board of Health shall remain unaffected by this subchapter."
With respect to the issue of mandatory hookups, A.C.A. § 14-235-302(a) provides:
 After the completion of any sewer or branch sewer authorized to be built under the provisions of this act, it shall be lawful for the board of health of any municipality to which this act is applicable, whenever, in their opinion, the public health will be promoted by it, to order any one (1) or more property owners near or adjacent to any sewer to construct upon their property sewers leading from some point or place on their premises to the sewer of the municipality. . . .
See Jernigan v. Harris, 187 Ark. 705, 62 S.W.2d 5 (1933) (board of health can direct connection with adjacent sewer and is obligated, in the event of noncompliance, to make the connection and to charge the property therewith). Although a city is consequently authorized to mandate hooking up to a municipal sewage system constructed under the act, this authority is qualified by A.C.A. § 14-235-304, which prohibits a municipal board of health from ordering or compelling anyone to construct a hookup running more than 300 feet from his property. Any refusal to hook up within this prescribed distance is a misdemeanor. A.C.A. § 14-235-301(a)(1). Cf. Cityof Mountain Home v. Ray, 223 Ark. 553, 267 S.W.2d 503 (1954) (although under police power the city could compel connection by civil process, city could impose criminal penalty only upon showing that failure to connect constituted a public hazard).
I appreciate that the foregoing does little to resolve your practical concerns, since the City of Fairfield Bay itself apparently owns no sewage system. The question becomes, then, whether the legislation just discussed might authorize the city to mandate that its citizens hook up to some other system, whether "within or without" the city's corporate boundaries. I believe the answer to this question is "no." Even assuming the reference in A.C.A. § 14-235-302(a) to "any sewer" might be read as including lines owned by another entity like the Facilities Board, the statute nevertheless recites as a condition precedent to the municipal board of health's mandate "the completion of any sewer or branch sewer authorized to be built under the provisions of this act." It is consequently questionable whether the city, having constructed nothing under the act, could order mandatory hookups — an order the highly autonomous Facilities Board would arguably be obliged to honor only if doing so were specified as a condition of the Facilities Board's operations in its creating ordinance.
 The Community Club
The question of whether the Community Club can mandate hookups to existing and future sewer systems will turn purely on its charter documents, the filed Covenants Restrictions and Bill of Assurance, and any contractual agreement with the owners of the systems the Community Club anticipates Fairfield Bay residents using. Given the intensely factual nature of this question, and further given that no provision of state law appears to apply, I am unable to venture an opinion on this issue.
 The State
Section 20-7-109 of the Code provides in pertinent part:
 (a)(1) Power is conferred on the State Board of Health to make all necessary and reasonable rules and regulations of a general nature for the protection of the public health and safety; for the general amelioration of the sanitary and hygienic conditions within the state; for the suppression and prevention of infectious, contagious, and communicable diseases; for the proper enforcement of quarantine, isolation, and control of such diseases; and for the proper control of chemical exposures that may result in adverse health effects to the public.
The Arkansas Sewage Disposal Systems Act, A.C.A. § 14-236-101 et seq.,
provides for state supervision through the Division of Sanitarian Services of the Department of Health over "community sewage systems" and "individual sewage disposal systems." A.C.A. § 14-236-107. The act broadly defines the term "community sewage system" as "any system, whether publicly or privately owned, serving two (2) or more individual lots, for the collection and disposal of sewage or industrial wastes of a liquid nature, including various devices for the treatment of the sewage or industrial wastes." The act defines the term "individual sewage disposal system" as "a single system of treatment tanks, disposal facilities, or both, used for the treatment of domestic sewage, exclusive of industrial wastes, serving only a single dwelling, office building, or industrial plant or institution." A.C.A. § 14-236-103(5).
Read literally, the above definition of "community sewage system" is broad enough to cover any sewage system serving more than a single lot, including systems owned by municipalities and facilities boards. However, the act, which concerns itself almost exclusively with the regulation of individual sewage disposal systems and the licensing of their installers, makes only the following, rather narrow reference to a "community sewage system":
 Property owners' associations that construct and maintain or have constructed and maintained sewage disposal facilities in accordance with the standards and regulations established by the Division of Sanitarian Services of the Department of Health or the Arkansas Department of Environmental Quality shall have jurisdiction over the disposal of sewage within and for the subdivided area over which their authority extends and shall have general supervision and authority over the location, design, construction, installation, and operation of individual and community sewage disposal systems to the extent that the general supervision and authority is consistent with this chapter and the rules and regulations promulgated thereunder.
Significantly, the act defines the term "property owners' association" to mean "an association created by and pursuant to state law and organized for the purpose of maintaining common facilities, including sewage disposal facilities[,] in unincorporated subdivisions." A.C.A. § 14-236-10 (emphasis added). This statute appears to assume that a property owners' association will have no authority over sewage disposal facilities located within a city — an assumption echoed in the Code's assigning to the Division of Sanitarian Services the power to "[d]elegate, at its discretion, to any municipality or, in the case of an unincorporated subdivision, the property owners association, any of its authority under this chapter in the administration of the rules and regulations adopted pursuant to this chapter." A.C.A. §14-236-107(b)(5). It would appear that the drafters of this legislation simply assumed that a municipality would invariably have ownership and control over all community sewage facilities located within its boundaries — an assumption I do not feel follows from any mandate of law and one that apparently conflicts with the actual circumstances in Fairfield Bay.
Whatever the basis for the definition of "property owners' association" discussed above, it is clear that the primary focus of the Sewage Disposal Systems Act is to control septic tanks and community systems run by property owners' associations. With respect to individual disposal systems, A.C.A. § 14-236-104(b) expressly identifies as the goal of the act prohibiting any system that constitutes a "health hazard" or a "nuisance due to odor or unsightly appearance." The act contains no provision authorizing any agency of the state to direct that citizens hook up to the sewage system of a municipality, a property owners' association or a county facilities board. On the contrary, the act expressly acknowledges that conforming individual sewage disposal systems will be allowed to continue in use. The act's overall scheme of licensing septic tank installers and monitoring individual systems is flatly inconsistent with any suggestion that the state would direct individuals to hook up to a community system. Accordingly, I am far from surprised by your report that "[t]he Arkansas Health Department declines to become involved in jurisdictional [sic] of lower governmental units unless there is a nuisance or health hazard."[4]
Your request reflects concern that future growth at Fairfield Bay may result in the location of so many individual sewage disposal systems that problems with runoff may occur. Assuming this proves to be the case, I believe the State Board of Health might well be authorized to mandate hookups pursuant to A.C.A. § 20-7-109, which empowers the Board to adopt "reasonable rules and regulations of a general nature" to ensure public health. Compare Arkansas Pollution Control Commission v. Coyne,252 Ark. 792, 481 S.W.2d 322 (1972) (reversing trial court ruling that Commission lacked the authority to deny eight Hot Springs residents approval to build homes in unsewered area when evidence supported the conclusion that lack of community sewer facilities posed a significant problem and that construction of the homes would create a significant pollution hazard). However, in the interim, I believe the more particular legislation contained in the Sewage Disposal Systems Act would preclude the Board of Health from simply banning septic tanks and directing sewer-system hookups at Fairfield Bay.
 The Corps of Engineers
At the conclusion of his analysis, the Fairfield Bay City Attorney remarks: "The matter could become even more complex because the [e]ffluent is discharged into Greers Ferry Lake — over which the U.S. Corps of Engineers has jurisdiction." This office does not normally opine on matters of federal law. Although I assume the Corps of Engineers has preemptive power to prohibit the discharge into Greers Ferry Lake of effluents that violate federal standards, I strongly doubt that its authority over Greer's Ferry Lake would warrant its dictating that individual households and businesses tie into any given community sewage disposal system. I suggest that local counsel for the interested parties contact the Corps directly for clarification regarding its policies.
 Possible Cooperative Efforts
The Wastewater Treatment Districts Act, A.C.A. § 14-250-102 et seq.,
provides for the establishment of nonprofit regional wastewater treatment districts. A district can be established under this chapter by petition of two or more municipalities to the circuit court of "a county which contains a significant portion of the proposed district." A.C.A. §14-250-106. The act does not define the term "municipality," and it is consequently unclear whether a court would give the term the following expansive definition contained in the Sewage Disposal Systems Act:
 "Municipality" means a city, town, county, district or other public body created by or pursuant to state law, or any combination thereof acting cooperatively or jointly.
A.C.A. § 14-236-103(7). I can infer, however, that the legislature indeed intended to define the term broadly, since the act provides that 51% of property owners in unincorporated areas must "approve by petition prior to being included in the district," A.C.A. § 14-250-106(b) — a condition that necessarily implies the county's participation. If the court were to define the term to include a county, Van Buren County and the City of Fairfield Bay might conceivably petition to form such a district.
Once filed, a petition is subject to review by the Arkansas Department of Environmental Quality, which will conduct an investigation and make its recommendations to the court. A.C.A. § 14-250-107. Following notice by publication, id., the court conducts a hearing to entertain objections and then, if it deems appropriate, issues an order establishing the district. A.C.A. § 14-250-108. Among the powers of the district's board of directors is the following:
 To fix, regulate, and collect rates, fees, rents, or other charges for wastewater collection and disposal and any other facilities, supplies, equipment, or services furnished by the wastewater district. The rates shall be just, reasonable, and nondiscriminatory.
A.C.A. § 14-250-112.
Assuming the city and county formed such a wastewater district, its directors would be authorized to contract with the Community Club and Facilities Board to provide sewage service. A.C.A. § 14-250-111(3). They would further be empowered to assess everyone within the district for such service. A.C.A. § 14-250-112.
Whether the board of directors could further dictate that everyone in the district actually hook up to the service is an entirely different question. In the enclosed Ark Op. Att'y Gen. No. 2000-003, I addressed whether a city might by ordinance require its residents to participate in garbage pickup removal. After reviewing the scope of the police power — an analysis I will not here repeat — I tentatively opined that a city could compel such participation. However, I believe the analysis may be different when a resident with a functioning septic tank that otherwise complies with state law would be required to expend a significant sum to hook into a sewer line, particularly in light of the fact that the Sewage Disposal Systems Act expressly authorizes such compliant individual systems. See discussion supra. Nevertheless, the legislature has declared that the Wastewater Treatment Act, which possibly imposes a different standard, "shall be construed liberally," A.C.A. § 14-250-105(a), "is complete in itself and shall be controlling," A.C.A. § 14-250-103(a). Under the circumstances, I believe legislative or judicial clarification is warranted.
Finally, I should mention one procedural alternative that I do not believe would serve the end you seek. As you mention in your request, A.C.A. § 14-137-108(a)(8)(A)(1) anticipates that a facilities board might enter into an interlocal agreement to provide services outside what would otherwise be its territorial jurisdiction. The Interlocal Cooperation Act, A.C.A. § 25-20-101 et seq., authorizes local governmental units to cooperate with each other in authorized joint ventures. However, A.C.A. § 25-20-104(a) contains a significant qualifier:
 Any governmental powers, privileges, or authority exercised or capable of exercise by a public agency of this state alone may be exercised and enjoyed jointly with any other public agency of this state which has the same powers, privileges, or authority under the law.
(Emphasis added.) In light of this statute, I do not believe an interlocal agreement between the city and county or among the city and more than one county could expand what appears to be only a qualified power invested in the city to mandate sewer hookups.
Question 2: Since the Community Club owns two (2) of the six (6) sewagetreatment plants and the lines served by those plants, should those linesand treatment plants be in the same position and governed by the same lawthat governs the plants and lines of the County Facilities Board? (TheCommunity Club acts as Manager of County Facilities Board System andapparently is acting for itself on two plants and lines.)
As reflected in my response to your previous question, although these two categories of sewage treatment plants are subject to the same environmental and health regulations, determining what requirements the Community Club and the Facilities Board can respectively impose on the residents of Fairfield Bay will involve two entirely distinct lines of inquiry. As suggested above, these inquiries will be highly fact intensive and are beyond the ability and authority of this office to conduct. However, I will note that I consider it irrelevant to these inquiries that the Community Club is acting as "manager" of the Facilities Board system.
Question 3: Are the meetings of the County Facilities Board subject tothe Arkansas Freedom of Information Act?
In my opinion, the answer to this question is "yes."
Subsection 25-19-106(a), contained within the Arkansas Freedom of Information Act ("FOIA"), A.C.A. § 25-19-101 et seq. (Repl. 1996 
Supp. 2001), provides:
 Except as otherwise specifically provided by law, all meetings, formal or informal, special or regular, of the governing bodies of all municipalities, counties, townships, and school districts and all boards, bureaus, commissions, or organizations of the State of Arkansas, except grand juries, supported wholly or in part by public funds or expending public funds, shall be public meetings.
Subsection 25-19-103(4) of the Code defines the term "public meetings" as follows:
 "Public meetings" means the meetings of any bureau, commission, or agency of the state, or any political subdivision of the state, including municipalities and counties, boards of education, and all other boards, bureaus commissions, or organizations in the State of Arkansas supported wholly or in part by public funds or expending public funds.
Subsection 25-19-106(c)(1) exempts from this requirement "executive sessions" of the following sort:
 Executive sessions will be permitted only for the purpose of considering employment, appointment, promotion, demotion, disciplining, or resignation of any public officer or employee. The purpose of the executive session shall be announced in public before going into executive session.
Section 14-137-114 of the Code provides in pertinent part:
 It is declared that each public facilities board created pursuant to this chapter will be performing public functions and will be a public instrumentality of the municipality or county creating the board.
Subsection 14-137-111(a)(1) of the Code further identifies a public facilities board as "a body politic and corporate." Moreover, A.C.A. §14-137-102(d) expressly identifies as "public financing" the revenues realized from any public facilities board bond issue. Given these legislative pronouncements, notwithstanding its qualified autonomy, see discussion supra, I believe a public facilities board is clearly subject to the "public meetings" requirement set forth above.
Question 4: Are the meetings of the Community Club, acting as manager ofthe County Facilities Board and for themselves, subject to the ArkansasFreedom of Information Act?
As reflected in my response to your previous question, the FOIA applies to all governmental entities within the state. A.C.A. §§ 25-19-103 and25-19-106(a). It also applies to "any other agency wholly or partially supported by public funds or expending public funds," A.C.A. §25-19-103(1) — a category that might include a private, nonprofit corporation like the Community Club. However, the mere receipt of public funds in itself will not suffice to bring a private organization within the reach of the FOIA. In addition, one must inquire whether the private entity carries on "public business" or is otherwise intertwined with the activities of government. City of Fayetteville v. Edmark, 304 Ark. 179,801 S.W.2d 275 (1990) (private attorneys retained by city); Op. Att'y Gen. Nos. 2000-039 (private non-profit corporation licensed by the Department of Human Services to provide services for the developmentally disabled), 95-273 (private non-profit area on agency designated to provide services to older Arkansas under a federal grant program) and 90-243 (non-profit organizations that receive grants from cities or counties under A.C.A. §§ 14-173-101 to -105 to promote economic development). The court in Edmark, in considering whether the files of private attorneys retained by a city were public records, determined that the FOIA should apply when the government "seeks to conduct its affairs through private entities," since in that situation "it seems clear that those entities are for all practical purposes the government itself."304 Ark. at 187, quoting J. Watkins, Access to Public Records Under theArkansas Freedom of Information Act, 37 Ark. L. Rev. 741, 764 (1984).
Professor Watkins has summarized the test that applies to private organizations as follows:
 [T]he FOIA applies only to private organizations that (1) receive public funds, (2) engage in activities that are of public concern, and (3) carry on work that is intertwined with that of government bodies. This approach is sound. If the mere receipt of public funds were enough to trigger the act, it would reach anyone who received government largesse, including welfare recipients and private hospitals that receive Medicare and Medicaid payments. As the Supreme Court has recognized, however, the FOIA should apply when the government `seeks to conduct its affairs through private entities,' for in that situation `the entities are for all practical purposes the government itself.' Or, as the Attorney General has put it, the FOIA covers a publicly funded organization that enjoys a `symbiotic relationship' with the state or its political subdivisions: `[w]hen the activities of a private organization and the government become intertwined, the private organization may well render itself part of the State for [FOIA] purposes.'
J. Watkins, The Arkansas Freedom of Information Act 42 (3rd ed. 1998) (footnotes omitted) (quoting Edmark, 304 Ark. at 187 and Ark. Op. Att'y Gen. No. 83-163).
As this office has previously noted, it is unclear just how "intertwined" the private entity must be with the government before the FOIA will be deemed applicable. See, e.g., Op. Att'y Gen. Nos. 96-013 and 92-205. It has been suggested that "perhaps the most obvious case of such intertwining occurs when a private entity receives public funds for the general support of activities that are closely aligned with those of government." The Arkansas Freedom of Information Act, supra at 43, citingRehab Hospital Services, Corp., supra (assistance of private body in reviewing proposed changes in the state's health care delivery system).See also Op. Att'y Gen. Nos. 2000-039 and 95-273, supra, and 90-236 (911 Communications Center supported by public funds), 89-372 (administrative body for a regional hazardous materials response team), 89-082 (nonprofit organization that assists local law enforcement in emergency situations).
With respect to meetings of the Community Club acting as manager of the Facilities Board — an entity I have concluded above is unquestionably "public" in character — the issue is whether the Community Club is compensated for its management services from the Facilities Board's public funds, and whether the nature of these services are such that the Community Club is effectively "intertwined" with the Facilities Board in the performance of what amounts to a governmental function. Although it would appear that managing the Facilities Board for compensation would in all likelihood meet this test, only a finder of fact could make this ultimate determination after a full review of the facts.
Additionally, under A.C.A. § 25-19-106(a), the Community Club would only be obliged to open its meetings if it might be characterized as the Facilities Board's "governing body." The FOIA does not define the term "governing body," and the Arkansas Supreme Court has never found occasion to address the issue. However, the Attorney General has consistently taken the position that the pertinent question in determining whether a group constitutes a "governing body" is whether the group has decision-making authority. See, e.g., Ark. Op. Att'y Gen. Nos. 2000-051
and 99-407; see also Watkins, Freedom of Information Act, supra, at 49 etseq. Groups that are advisory in nature do not generally constitute "governing bodies." The question of whether a particular group constitutes a "governing body" is consequently one of fact that this office cannot definitively answer. Although it seems logical that a "manager" will qualify as a decision-maker, one can conclude as much in any particular instance only after reviewing the group's actual functions.
With respect to meetings of the Community Club not devoted to managing the Facilities Board, the applicability of the FOIA can likewise be determined only upon a review of the facts. In your request, the Fairfield Bay City Attorney has described the Community Club as a private, nonprofit property owners' association that sometimes functions in a "quasi-governmental capacity" — a characterization that suggests that its meetings should be open to the public.[5] However, even assuming the Community Club served some "quasi-governmental" purpose in the past, there is at the very least a fact question whether it continues to serve that purpose since the City of Fairfield Bay incorporated. As one of my predecessors noted in the attached Ark. Op. Att'y Gen. No.93-092:
 [T]he FOIA is not applicable to a property owners' association which is composed of private owners in a geographic area organized to direct policy for that area, as such a POA normally has no public or governmental status. See Op. Att'y Gen. 85-29 [attached]. . . .
Moreover, only a finder of fact can determine whether the Community Club is "supported wholly or in part by public funds or expending public funds," which might independently trigger application of the FOIA pursuant to A.C.A. § 25-10-106(a). In addition, as noted above, even if the Community Club were a recipient of public funds, the FOIA would still not apply unless the funds were put to some public purpose intertwined with that of government bodies. See Edmark, supra; Watkins, supra at 42; Ark. Op. Att'y Gen. No. 2001-069.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
Enclosures
[1] As my predecessor noted in his opinion, the Arkansas Supreme Court has ruled that a governing body that has created a water and sewer commission by ordinance could likewise abolish the commission by majority vote so long as no bonds are outstanding. City of Ward v. Ward Water Sewer System, 280 Ark. 177, 655 S.W.2d 454 (1983). I agree with my predecessor that the same conclusion applies to public facilities boards.
[2] Although A.C.A. § 14-137-112(a) authorizes the transfer by gift of facilities from the county to a facilities board, nothing in the Code authorizes a gratuitous transfer of property from the board to the county.
[3] You suggest in your request that these statutory exemptions from outside regulation should not apply to any generally applicable statutes or regulations enacted or adopted after 1975, when the statute at issue was enacted. I disagree. Subsection (b) of the statute unequivocally states that the construction of public facilities projects need not comply with "any other law" that would otherwise apply. Subsection (c) provides that "except as otherwise expressly provided in this chapter, none of the powers granted to a board under the provisions of this chapter shall be subject to the supervision or regulation" of the state or county. (Emphasis added.) In my opinion, these provision reflect a clear legislative intent to insulate public facilities boards from future, as well as current, outside control. These statutes do not strike me as ones that can be repealed by implication by the subsequent enactment of legislation that does not expressly state that it will apply to facilities boards.
[4] I am further not surprised by your report that the City of Fairfield Bay has adopted a narrow interpretation of A.C.A. §14-236-105, which provides:
 The provisions of any law or regulation of any municipality establishing standards affording greater protection to the public health or safety shall prevail within the jurisdiction of the municipality over the provisions of this chapter and regulations adopted hereunder.
You report that by the city's reading of this statute, it "is limited to establishing standards which afford greater protection or safety (such as requiring the [e]ffluent to be purer or have less suspended solids)." (Emphasis yours.) As the foregoing analysis should suggest, to the extent that your statement is intended to suggest that the city can impose greater restrictions by ordinance on facilities owned by the Facilities Board or the Community Club within the city's jurisdiction, I believe even this statement of limitation is overly broad. As suggested in the text of my discussion, unless its creating ordinance dictates otherwise, the Facilities Board is an autonomous entity beyond the reach of city regulation. Moreover, the Sewage Disposal Systems Act basically regulates only the installation and operation of septic tanks wherever located and community facilities in unincorporated areas. See attached Ark. Op. Att'y Gen. No. 99-221 (opining that the Sewage Systems Disposal Act authorizes a county ordinance imposing greater restrictions on individual sewage disposal systems than imposed by the act itself). It would thus appear that the city is empowered to impose additional restrictions only on individual sewage disposal systems within its jurisdiction and, curiously, on any Community Club facility that happens to be located within the city's ten-mile jurisdiction outside its corporate boundaries. If this latter grant of authority is not what the legislature intended, an amendment of the statute seems warranted.
[5] The Fairfield Bay City Attorney cites Kell v. Bella Vista Village,258 Ark. 757, 528 S.W.2d 651 (1975) in apparent support of this proposition. However, the court in Kell only considered the enforceability of certain covenant assessments contained in the Bella Vista bill of assurance. The court at no point characterized any activity of the property owners' association as "quasi-governmental."