George HUTCHENS, Don Skeahan, and Robert Scott *v.*
BELLA VISTA VILLAGE PROPERTY OWNERS'
ASSOCIATION, INC.

CA 02-925 110 S.W.3d 325

Court of Appeals of Arkansas
Division IV
Opinion delivered April 30, 2003

30

*Jerry B. Dossey, PLC*, by: *Brian D. Burke* and *Jerry B. Dossey*, for appellants.

*Connor & Winters, P.L.L.C.*, by: *John R. Elrod* and *Vicki Bronson*; and *Boyer, Schrantz, Rhoads & Teague*, by: *Douglas R. Schrantz*, for appellee.

OLLY NEAL, Judge. This is an appeal from an order of the Benton County Circuit Court, granting appellee's motion for summary judgment. Appellants challenge the trial court's finding that the protective covenants for Bella Vista Village permitted the implementation of a two-tiered assessment scheme based on whether a lot is improved or unimproved. They also argue that the trial court erred when it ignored the precedential treatment of *Kell v. Bella Vista Village Property Owners' Ass'n*, 258 Ark. 757, 528 S.W.2d 651 (1975), on the issue of equal application of assessments to all lots in a subdivision. We affirm.

Bella Vista Village is a planned residential and commercial community that was formed in 1965. In accordance with the terms of the Bella Vista Declaration, the appellee, Bella Vista Village Property Owners' Association (POA), was established to manage the affairs of Bella Vista Village. Every Bella Vista property owner is a member of the POA, and their property is subject to the declaration.

At issue in this appeal is article X of the declaration, which provides the framework whereby general annual assessments are levied against the property in Bella Vista. Article X provides, in part, as follows:

### ARTICLE X

### Covenant for Maintenance Assessments

**Section 1. Creation of Lien**. The Developer of each Lot and Living Unit owned by it within The Properties hereby covenants and each Owner of any Lot or Living Unit by acceptance of a deed therefor, or by entering into a contract of purchase with the Developer, whether or not it shall be so expressed in any such

deed, contract of purchase, or other conveyance, shall be deemed to covenant and agree to pay to the Club: (1) annual assessments of charges; (2) special assessments for capital improvements, such assessments to be fixed, established and collected from time to time as hereinafter provided. The annual and special assessments, together with such interest thereon and costs of collection thereof as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the property against which each such assessment is made.

**Section 2. Purpose of Assessments.** The assessments levied hereunder by the Club shall be used exclusively for the purpose of promoting the recreation, health, safety, and welfare of the residents in The Properties and in particular for the improvement and maintenance of properties, services and facilities devoted to this purpose and related to the use and enjoyment of the Common Properties and the improvements situated on The Properties, including, but not limited to, the payment of taxes and insurance thereon, and repair, replacement, and additions thereto, and for the cost of labor, equipment, materials, management and supervision thereof. The limitation aforesaid shall not preclude the use of assessments levied hereunder for maintenance of roads and streets within The Properties, even though same have been dedicated to the public.

**Section 3. Basis and Maximum of Annual Assessments.** Until the year beginning January, 1970, the annual assessment shall be $60.00 per Lot or Living Unit. From and after January 1, 1970, the annual assessment may be increased by vote of the members, as hereinafter provided, for the next succeeding three years and at the end of each such period of three years for each succeeding period of three years. Unless the annual assessment shall be increased as aforesaid, it shall remain at $60.00 per Lot or Living Unit.

The Board of Directors of the Club may, after consideration of current maintenance costs and future needs of the Club, fix the actual assessment for any year at a lesser amount. Likewise, the Board of Directors of the Club may, after consideration of the lack of improvements as to lots in certain areas, fix the actual assessment for any year as to these particular lots at a lesser amount.

**Section 4. Special Assessments for Capital Improvements**. In addition to the annual assessments authorized by Section 3 hereof, the Club may levy in any assessment year a special assessment, applicable to that year only, for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, unexpected repair or replacement of the roads and streets within The Properties, even though same may have been dedicated to the public, and also a described capital improvement upon the Common Properties, including the necessary fixtures and personal property related thereto, provided that any such assessment shall have the assent of 51% of the votes of each class of members who are voting in person or by proxy at a meeting duly called for this purpose, written notice of which shall be sent to all Members at least 30 days in advance and shall set forth the purpose of the meeting. The Board of Directors of the Club may, after consideration of lack of improvements as to lots in a certain area, fix the actual assessment for any year as to these particular lots at a lesser amount.

**Section 5. Change in Basis of Maximum of Annual** Assessments. Subject to the limitations of Section 3 hereof, and for the purpose therein specified, the Club may change the maximum and basis of the assessments fixed by Section 3 hereof prospectively for any such period provided that any such change shall have the assent of 51% of the votes of each Class of Members who are voting in person or by proxy, at a meeting duly called for this purpose, written notice of which shall be sent to all Members at least 30 days in advance and shall set forth the purpose of the meeting.

**Section 6. Quorum for Any Action Authorized Under Sections 4 and 5**. The Quorum of any actions authorized by Section 4 and 5 hereof shall be as follows:

At the first meeting called as provided in Sections 4 and 5 hereof, the presence at the meeting of Members, or of proxies, entitled to cast 50% of all votes of each class of membership shall constitute a quorum. If the required quorum is not forthcoming at any meeting, another meeting may be called, subject to the notice requirement set forth in Sections 4 and 5, and the required quorum at any such subsequent meeting shall be one-half of the required quorum at the preceding meeting, provided that no such subsequent

meeting shall be held more than 90 days following the preceding meeting.

\* \* \*

The declaration initially set the general annual assessment at sixty dollars per lot or living unit. However, in May of 2001, the POA board of directors submitted a ballot issue to the membership that would, if approved, have the effect of raising the assessment as to improved lots by ten dollars per month and the assessment as to unimproved lots by two dollars per month, effectively creating a two-tier assessment scheme based solely on the determination of whether a particular lot is improved or unimproved. Valid proxies were submitted by 52.4% of the membership. Of those received, 11,530 members voted in favor of the two-tiered assessment and 7,643 members voted against it.

On August 23, 2001, appellants filed their complaint for declaratory judgment, seeking a determination from the circuit court that the declaration provides no authority to the membership to establish a two-tiered assessment scheme. Thereafter, the parties each filed motions for summary judgment and a hearing was had on these motions on May 9, 2001. Following the hearing, the trial court granted appellee's motion for summary judgment and denied appellants' motion. From that decision comes this appeal.

■ ■ Ordinarily, an order denying a motion for summary judgment is not an appealable order. *Karnes v. Trumbo*, 28 Ark. App. 34, 770 S.W.2d 199 (1989). However, when the order denying the motion is combined with a dismissal on the merits that effectively terminates the proceedings below, it is appealable. *Shelter Mut. Ins. Co. v. Williams*, 69 Ark. App. 35, 9 S.W.3d 545 (2001). The standard of review when an order denying a motion for summary judgment is appealed is whether the trial court abused its discretion in denying the motion. *Karnes v. Trumbo, supra*. Further, where the parties agree on the facts, we simply determine whether the appellee was entitled to judgment as a matter of law. *Tunnel v. Progressive Northern Ins. Co.*, 80 Ark. App. 215, 95 S.W.3d 1 (2003).

Appellants argue first that the trial court erred when it found that the protective covenants for Bella Vista Village permitted the implementation of a two-tiered assessment scheme where the amount of a lot's assessment is determined by whether the lot is improved or unimproved. Specifically, appellants state that:

> The sole issue in this case is whether the restrictive covenants provide any authority for the POA's creation of a general two-tiered scheme of assessments by less than a two-thirds affirmative vote of the members. . . . Appellants contend that there is no authority under the Declaration as written for such a general two-tiered assessment, and that the circuit court erred when it found otherwise.

A restrictive covenant is defined as a "private agreement, usually in a deed or lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." *Black's Law Dictionary* 371 (7th ed. 1999). Restrictive covenants are not favored, and if there is any restriction on land, it must be clearly apparent. *See Holaday v. Fraker*, 323 Ark. 522, 915 S.W.2d 280 (1996). Restrictive covenants are to be strictly construed against limitations on the free use of property, and all doubts are resolved in favor of the unfettered use of land. *Forrest Constr. v. Milam*, 345 Ark. 1, 43 S.W.3d 140 (2001). The general rule governing the interpretation, application, and enforcement of restrictive covenants is that the intention of the parties as shown by the covenant governs. *Id.*

We hold that the covenant for maintenance assessment contained in Article X of the Bella Vista Village Declaration does not fall within the definition of a restrictive covenant; thus, strict construction is not required.

We have not previously addressed the review of actions of a property owners' association which adversely affect some its members. Courts in other jurisdictions have concluded that there are limits upon the majority's authority in these circumstances. In *Buckingham v. Weston Village Homeowners Ass'n*, 571 N.W.2d 842, 844 (N.D. 1997) (citing *Thanasoulis v. Winston Towers 200 Ass'n*, 110 N.J. 650, 542 A.2d 900, 903 (1988)), the

supreme court of North Dakota held that condominium associations have a fiduciary duty to their unit owners. "Courts have accordingly adopted a 'reasonableness' rule, holding that, although the condominium's governing body has broad authority to regulate the internal affairs of the development, this power is not unlimited, and any rule, regulation, or amendment to the declaration or bylaws must be reasonable." *Id.* at 844 (citing *O'Buck v. Cottonwood Village Condominium Ass'n*, 750 P.2d 813, 817 (Alaska 1988); *Johnson v. Hobson*, 505 A.2d 1313, 1317 (D.C. 1986); *Scudder v. Greenbrier C. Condominium Ass'n*, 663 So.2d 1362, 1369 (Fla. Dist. Ct. App. 1995); *Ridgely Condominium Ass'n v. Smyrnioudis*, 343 Md. 357, 681 A.2d 494, 498 (1996); *Bluffs of Wildwood Homeowners' Ass'n v. Dinkel*, 96 Ohio App. 3d 278, 644 N.E.2d 1100, 1102 (1994)). Under the reasonableness test, a rule which is unreasonable, arbitrary, or capricious is invalid. *Id.* at 844-45 (citing *Worthinglen Condominium Unit Owners' Ass'n v. Brown*, 57 Ohio App. 3d 73, 566 N.E.2d 1275, 1277 (1989)). In applying the reasonableness test, the reviewing court must determine:

> (1) whether the decision or rule is arbitrary,
>
> (2) whether the decision or rule is applied in an even-handed or discriminatory manner; and
>
> (3) whether the decision or rule was made in good faith for the common welfare of the owners and occupants of the condominium.

*Blufffs of Wildwood*, 644 N.E.2d at 1102. Courts will especially consider whether the majority's action has an unfair or disproportionate impact on only certain unit owners. *See Johnson*, 505 A.2d at 1318. The reasonableness test[:]

> protects against the imposition by a majority of a rule or decision reasonable on its face, in a way that is unreasonable and unfair to the minority because of its effect is to isolate and discriminate against the majority. It provides a safeguard against a tyranny by the majority.

*Worthinglen*, 566 N.E.2d at 1275.

*Id.* at 845.

 As in *Buckingham, supra,* the facts in this case demonstrate the need for limitations on the majority's authority to

change the method of assessments. We hereby adopt the "reason-ableness" test and conclude that the power of the governing body of a property owners' association, homeowner's association, or condominium's association to make rules, regulations, or amend-ments to its declaration or bylaws is limited by a determination of whether the action is unreasonable, arbitrary, capricious, or discriminatory.

As appellee points out, the declaration does not state that the maximum and minimum must be the same for all lots. The only requirement contained in the declaration is that the assessment be approved by at least 51% of the voting members, which in this case, was done. Further, appellee points us to other jurisdictions where the two-tiered system has been upheld. In *Longanecker v. Diamondhead Country Club*, 760 So.2d 764 (Miss. 2000), the prop-erty owners' association was faced with an increase in the amount charged by the security company that provided security service to the residents. To help cover the additional cost, the board voted to charge five dollars per month in additional fees to owners of sin-gle-family dwellings, three dollars per month in additional fees to owners of condominiums, and no additional charge to owners of unimproved lots. Certain owners of single-family dwellings brought suit alleging that the two-tiered system of assessments was invalid under both a Mississippi statute, which provided that all members shall have the same rights and obligations, and the cove-nants governing the association. The Mississippi Supreme Court found the system permissible, citing *Ackerman v. Sudden Valley Community Ass'n*, 89 Wash. App. 156, 944 P.2d 1045 (1997), stating:

> Similarly in this case, the different assessments did not create dif-ferent classes of members. The distinction was rationally based on the purpose of the fees, i.e. owners of improved lots are more likely to use and need the benefits of security than owners of unimproved parcels of land. The distinction did not affect the other rights or obligations of the members in any way.

*Longanecker v. Diamondhead Country Club*, 760 So.2d at 771.

Likewise in the instant matter, members are charged varying "usage" fees for use of various POA amenities, but even

more significant is the fact that the declaration does not specifically require equal assessment. Therefore, we hold that the creation of a two-tiered assessment scheme by the Bella Vista Village POA's members was not unreasonable, arbitrary, capricious or discriminatory. Accordingly, we affirm.

Appellants also argue that the trial court erred when it ignored the precedential treatment of *Kell v. Bella Vista Village Property Owners Ass'n*, 258 Ark. 757, 528 S.W.2d 651 (1975), on the issue of equal application of assessments to all lots in a subdivision. In *Kell*, the court indicated that "[t]he provisions of Sections 3 and 4 of Article X, *supra*, providing that appellee may, after consideration of the lack of improvements as to lots in a certain area, fix the actual assessment for any year as to these particular lots at a lesser amount appears to be invalid since the owners thereof have the same privilege of using the common facilities as do any of the residents of improved lots." There is no merit in appellants' argument.

 The issues in *Kell* were whether (1) appellants' property constituted their homestead subject to the lien of the assessment; (2) appellants were bound to pay the annual assessments because the covenants did not run with the land; (3) appellants are bound by the lien created; (4) the covenant constitutes a perpetuity; (5) the developer was entitled to ten votes for each lot or living unit of which it was record owner; (6) the assessments arose out of contract and constitute a benefit to the property owner; and (7) the assessments were restraints on alienation. We have stated that dicta consists of statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to the determination of the case in hand, and they lack the force of an adjudication. *See Clemmons v. Office of Child Support Enforcement*, 345 Ark. 330, 47 S.W.3d 227 (2001). The issue in this case was not before the court in *Kell, supra*. Thus, what was said in dicta in *Kell* has no bearing on what we have decided here.

Affirmed.

PITTMAN and ROAF, JJ., agree.