LYLE G. CUNNINGHAM, WALTER JAMES PENROD, THOMAS R. MELLINGER AND RONALD S. POWELL, PLAINTIFFS v. CITY OF GREENSBORO, DEFENDANT

No. COA10-584

(Filed 17 May 2011)

**1. Cities and Towns— utilities agreement with developers— not between municipalities—not an annexation agreement**

Agreements between a municipality and developers that provided for extension of water and sewer services in exchange for a petition for annexation and the payment of fees were not annexations governed by N.C.G.S. § 160A-58.21 *et seq.* because the agreements were not between participating municipalities and were not annexation agreements as defined by statute.

**2. Cities and Towns— utilities agreement with developers— subsequent owners—withdrawal of consent to annexation**

Summary judgment was properly granted for plaintiffs where the original developers entered into annexation agreements with defendant in exchange for water and sewer services, but the deeds to lots subsequently sold made no reference to those agree-

**CUNNINGHAM v. CITY OF GREENSBORO**

[212 N.C. App. 86 (2011)]

ments. Allowing plaintiffs to withdraw their consent to the annexation of the properties was not contrary to the literal language or the intent underlying N.C.G.S. § 160A-31, the statute governing voluntary annexation proceedings.

**3. Cities and Towns— utilities agreement with developers— support for annexation—not agreed to by subsequent owners**

Defendant was not authorized by N.C.G.S. § 160A-314(a) to require annexation as a condition for the extension of utility services where defendant and the original developers had agreed to such terms but the deeds to individual lots made no reference to those agreements. Even if a municipality had the authority to condition the provision of water and sewer services on a customer's agreement to support annexation, the record contained no indication that defendant did so when it connected any individual customer.

**4. Cities and Towns— utilities and annexation agreement with developers—not covenant running with the land**

Summary judgment was properly granted for plaintiffs in an action arising from agreements between defendant and developers to extend utilities in exchange for annexation where defendant argued that the agreements were enforceable covenants that ran with the land.

**5. Real Property— implied equitable servitude—not adopted in North Carolina**

The doctrine of implied equitable servitude has not been adopted in North Carolina and did not apply in an action involving an attempt to enforce against individual subsequent landowners an agreement between defendant and developers to extend utilities service in exchange for annexation.

Appeal by defendant from judgment entered 5 February 2010 by Judge Edwin G. Wilson in Guilford County Superior Court. Heard in the Court of Appeals 15 November 2010.

*Eldridge Law Firm, P.C., by James E. Eldridge, for Plaintiff-Appellees.*

*Office of the City Attorney, by James A. Clark, for Defendant-Appellant.*

ERVIN, Judge.

Defendant City of Greensboro appeals from an order granting summary judgment in favor of Plaintiffs Lyle Cunningham, Walter Penrod, Thomas Mellinger, and Ronald Powell by declaring that the contractual provisions under which Defendant attempted to annex Plaintiffs' properties were unenforceable. On appeal, Defendant argues that the trial court's decision contravened various statutory provisions governing the activities of municipal governments and that the contractual provisions upon which Defendant relies were either valid covenants that ran with the land or enforceable equitable servitudes. After careful consideration of Defendant's challenges to the trial court's order in light of the record and the applicable law, we conclude that the trial court correctly granted summary judgment in favor of Plaintiffs and that its order should be affirmed.

## I. Factual Background

### A. Substantive Facts

The present litigation stems from the parties' disagreement about the effect of certain documents executed by Defendant and three real estate developers, including:

A. [An] October 15, 1997 Agreement between [Defendant] and Millstream LLC for the Whitehurst development;

B. [A] May 12, 1999 Agreement between [Defendant] and D.R. Horton, Inc., for the Hartwood development; and

C. [A] July 10, 2000 Agreement between [Defendant] and Laurel Park, LLC for the Laurel Park development.

These agreements, each of which were entitled "Utility Agreement and Annexation Petition," provided that, in exchange for Defendant's willingness to extend water and sewer service to the affected developments, the developers who owned the applicable real property at that time petitioned for annexation of their development and agreed to pay fees imposed by Defendant for water and sewer service. In addition, each utility agreement specified that no vested zoning rights had been established and that Defendant was authorized to "terminate the water and sewer services" in the event that the annexation petitions were withdrawn. Finally, each utility agreement stated that "[t]he conditions contained herein attach to, and shall run with, the described real property" and provided that the agreement was "binding upon the heirs, assigns, transferees, and successors in interest of the Owners and shall, upon execution, be recorded in the Office of

the Register of Deeds of Guilford County, North Carolina." Although the utility agreements were signed by Defendant and by the developers who owned the property where each subdivision would be located, and were recorded in the Guilford County Register of Deeds office, the deeds to individual lots in each affected subdivision, including the lots subsequently sold to Plaintiffs, made no reference to the existence of these agreements.

The annexation proceedings at issue here began in 2008, which was about eight years after the date upon which the last agreement had been signed. On 18 March 2008, Defendant's assistant city attorney executed a certificate addressing the sufficiency of the petitions by which Defendant sought to annex Plaintiffs' properties in which she stated that:

> Utility Agreement and Annexation Petitions having been received for the annexation of the properties belonging to D. R. Horton, Inc.—Greensboro, Millstream, LLC and Laurel Park, LLC, I submit the following report thereon:

> The total number of property owners is three; the number signing the petitions is three. I, therefore, certify that the petitions are properly signed and are legally sufficient.

Although the assistant city attorney's certificate asserted that there were only three property owners in the area to be annexed, the record shows that, by 2008, lots had been sold to numerous individual purchasers in each subdivision. As a result, it appears that the certificate signed by the assistant city attorney was making reference to the three original developers who signed the utility agreements, rather than to the current owners of property in the affected areas.

On 1 April 2008, Defendant scheduled a public hearing to discuss annexation of the areas identified in the annexation petitions contained in the utility agreements. The public meeting was continued until 7 April 2009, at which time thirty-nine individuals who owned property within the affected area, including Plaintiffs, submitted signed Owner's Withdrawals Of Petition For Annexation in which they withdrew their consent to the annexation of their properties. Even so, the City voted, by a 5-4 vote, to adopt an ordinance annexing the affected area on 21 April 2009.

## B. Procedural History

On 18 June 2009, Plaintiffs filed a complaint for declaratory judgment in which they challenged the validity of the annexation ordi-

nance and sought temporary and preliminary injunctive relief directed against its implementation, a declaration that the annexation ordinance was null and void, and a declaration of the rights of the parties under the utility agreements. On 19 June 2009, Judge Ripley E. Rand temporarily enjoined enforcement of the annexation ordinance pending a hearing on Plaintiffs' preliminary injunction motion, which he set for 29 June 2009. After providing the parties with an opportunity to be heard on 29 June 2009, Judge Catherine C. Eagles denied Plaintiffs' request for the issuance of a preliminary injunction.

On 24 August 2009, Defendant filed an answer asserting that the utility agreements were binding upon all property owners in the affected subdivisions, including Plaintiffs, and asking that Plaintiffs' complaint be dismissed. On 21 January 2010, Plaintiffs moved for summary judgment. After a hearing held on 2 February 2010, the trial court entered summary judgment in favor of Plaintiffs on 5 February 2010, concluding that:

> [S]ummary judgment is granted in favor of Plaintiffs against the Defendant such that the ordinance adopted by Defendant's governing body on April 21, 2009 . . . is hereby declared null and void and . . . the costs of this action be awarded in favor of Plaintiffs and against Defendant.

Defendant noted an appeal to this Court from the trial court's order.

## II. Legal Analysis

### A. Standard of Review

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). In the present case, Defendant does not claim that disputed issues of fact exist, and we have not discovered any such disputed factual issue during the course of our own review of the record. As a result, the only remaining question before us is the extent, if any, to which Plaintiffs were entitled to judgment as a matter of law, an issue which we address utilizing a *de novo* standard of review. *Ron Medlin Const. v. Harris*, —— N.C. ——, ——, 704 S.E.2d 486, 488 (2010) ("This Court reviews a trial court's entry of summary judgment *de novo*.") (citation omitted).

### B. Withdrawal of Consent to Annexation

The present annexation was undertaken pursuant to N.C. Gen. Stat. § 160A-31(a), which provides that:

The governing board of any municipality may annex by ordinance any area contiguous to its boundaries upon presentation to the governing board of a petition signed by the owners of all the real property located within such area. The petition shall be signed by each owner of real property in the area and shall contain the address of each such owner.

The annexation petitions at issue here were signed by the original developers, as part of agreements for the provision of water and sewer utility service, years before the initiation of the present annexation proceedings. In *Conover v. Newton*, 297 N.C. 506, 518, 256 S.E.2d 216, 224 (1979), the Supreme Court held that "petitioners may withdraw at any time up until the governing municipal body has taken action upon the petition by enacting an ordinance annexing the area described in the petition." Although Defendant contends that Plaintiffs were bound by the language in the utility agreements precluding the owner or a future property owner from withdrawing his or her consent to the annexation, Plaintiffs argue that, as property owners at the time of the actual annexation proceeding, they had the legal authority to withdraw their consent and that their decision to do so precluded adoption of the annexation ordinance. As a result, the ultimate issue before us is the extent, if any, to which Plaintiffs were legally precluded from withdrawing their consent to the annexation of their properties.

## C. Relevant Statutory Provisions

In seeking to persuade us that Plaintiffs lacked the authority to withdraw their consent to the annexation of their properties, Defendant initially contends that the trial court's decision contravenes a number of statutory provisions. Although Defendant's argument in reliance on these statutory provisions is not entirely clear, we understand Defendant's position to hinge on N.C. Gen. Stat. § 160A-58.21 *et seq.*, N.C. Gen. Stat. § 160A-31(a), and N.C. Gen. Stat. § 160A-314(a). After a careful review of Defendant's arguments, we conclude that the trial court's decision is not inconsistent with any of the statutory provisions upon which Defendant relies.

### 1. N.C. Gen. Stat. § 160A-58.21 *et seq.*

[1] First, Defendant contends that the trial court's decision is inconsistent with N.C. Gen. Stat. § 160A-58.21, *et seq.*, which "authorize cities to enter into binding agreements concerning future annexation in order to enhance orderly planning by such cities as well as residents and property owners in areas adjacent to such cities." Pursuant

to N.C. Gen. Stat. § 160A-58.23, "[t]wo or more cities may enter into agreements in order to designate one or more areas which are not subject to annexation by one or more of the participating cities." According to Defendants, allowing Plaintiffs to withdraw their consent to the annexation of their properties would be "contrary to the provisions" of N.C. Gen. Stat. § 160A-58.24, which precludes modification of such annexation agreements in the absence of a written agreement signed by the affected municipalities. The fundamental problem with Defendant's reliance on N.C. Gen. Stat. § 160A-58.21 and related statutory provisions is that the annexation agreements authorized by those statutory provisions must be between participating municipalities. Obviously, that is not the case in this instance. Moreover, the utility agreements at issue here are not annexation agreements as defined in N.C. Gen. Stat. § 160A-58.24(a), since they do not "[s]pecify one or more participating cities which may not annex the area or areas described in the agreement." Instead, the utility agreements at issue state that Defendant will provide water and sewer service to the affected developments and will require owners of property in the affected subdivisions to pay the appropriate fees for water and sewer service, to petition for the annexation of their subdivisions, and to refrain from withdrawing their consent to any subsequent annexation.[1] The legal relevance of the statutory provisions governing annexation agreements between municipalities to agreements of the type at issue here is not obvious to us, and Defendant has not demonstrated that these provisions have anything to do with the present controversy. As a result, we conclude that the agreements in question are not annexation agreements governed by the statutory provisions upon which Defendant relies.[2]

---

1. In its brief, Defendant asserts that, "[w]hen the Plaintiffs purchased their properties, their lots were subject to all restrictions of record." According to well-established North Carolina law, "a restrictive covenant is not enforceable, either at law or in equity, against a subsequent purchaser of property burdened by the covenant unless notice of the covenant is contained in an instrument in his chain of title." *Runyon v. Paley*, 331 N.C. 293, 313, 416 S.E.2d 177, 191 (1992). "A purchaser has such notice whenever the restrictions appear in a deed or in any other instrument in his record chain of title." *Hawthorne v. Realty Syndicate, Inc.*, 300 N.C. 660, 665, 268 S.E.2d 494, 497 (1980). Although Plaintiffs executed affidavits stating that there was no reference to the pertinent agreement in the deeds to their properties, Defendant has not identified any document in Plaintiffs' chains of title that refers to a utility agreement or asserted that documents evidencing such a reference exist. As a result, Defendant has failed to establish that Plaintiffs had proper notice of the agreements.

2. In advancing this argument, Defendant contends that the "sole consideration" it received from the utility agreements was the developers' agreement to petitions

## 2. N.C. Gen. Stat. § 160A-31

**[2]** Secondly, Defendant argues that the result reached in the trial court would thwart the purpose of the voluntary annexation statutes and "run[] contrary to the express purpose of the laws allowing annexation agreements." We conclude, however, that allowing Plaintiffs to withdraw their consent to the annexation of the properties is not contrary to the literal language of or the intent underlying N.C. Gen. Stat. § 160A-31, the statute governing voluntary annexation proceedings.

The agreements at issue here purport to waive, on behalf of future property owners, any right to withdraw consent to annexation by Defendant, regardless of the point in time at which Defendant might seek to annex the subject properties and regardless of the conditions that might exist at that time. In *Conover*, the Supreme Court found that various public policy considerations favored allowing individual property owners to withdraw their consent to a voluntary annexation petition:

> "It is supposed that second thoughts are apt to be sounder, and this conviction has led courts to consider the right of withdrawal favorably, both as a matter of justice to the individual, who is entitled to apply his best judgment to the matter in hand, and as sound policy in community and public affairs, where the establishment of governmental institutions should rest upon mature consideration rather than be mere unnecessary excrescences upon the body politic, raised by the whim and fancy of a few men." . . .

We think both considerations relied upon in Idol, justice to the individual and policies favoring the establishment of governmental institutions only upon mature reflection, are equally applicable to a voluntary annexation petition. The first consideration is applicable by the very nature of the annexation proceeding

---

for annexation and that permitting Plaintiffs to exercise their right to withdraw consent from an annexation petition would "deprive [Defendant] of its consideration." Wholly aside from the other difficulties that Defendant faces in establishing that various statutory provisions preclude Plaintiffs from withdrawing their consent to the annexation of their properties, the record reflects that Plaintiffs and other property owners living in the affected subdivisions have been receiving water and sewer service from Defendant and have either paid the rates that Defendant has charged for that service or been subject to disconnection. As a result, to the extent that the consideration issue is relevant to the proper disposition of this case, we do not believe that Plaintiffs' withdrawal of consent to annexation deprives Defendant of all benefit from the provision of utility service to Plaintiffs and other persons receiving utility service in the affected areas.

authorized by statute, *i.e.*, *voluntary* annexation by the consent of all property owners in the area proposed to be annexed. Because the annexation of an area by a municipality involves substantially more extensive consequences and obligations, application of the second consideration is even more appropriate than it was in *Idol* in which only the establishment of a single-purpose district was involved.

*Conover*, 297 N.C. at 516, 256 S.E.2d at 223 (quoting *Idol v. Hanes*, 219 N.C. 723, 725, 14 S.E.2d 801, 802 (1941)) (emphasis in the original). Nothing in the literal language of N.C. Gen. Stat. § 160A-31(a) sets any time limitation within which a petitioning landowner is entitled to withdraw his or her consent to a proposed voluntary annexation, and the imposition of such a limitation would be inconsistent with the policy justifications for allowing such withdrawals enunciated in *Conover*. Although *Conover* was decided in 1979, the General Assembly has not amended the relevant statutory provisions in the ensuing three decades in order to eliminate or set limitations upon the right of property owners to withdraw their consent to a voluntary annexation petition. "The failure of a legislature to amend a statute which has been interpreted by a court is some evidence that the legislature approves of the court's interpretation." *Young v. Woodall*, 343 N.C. 459, 462-63, 471 S.E.2d 357, 359 (1996). Thus, we conclude that allowing Plaintiffs to exercise the right to withdraw their consent to the annexation petitions at the time at which they attempted to do so in this case does not violate either the language or the intent of N.C. Gen. Stat. § 160A-31 or the other statutory provisions governing voluntary annexations.

Although Defendant acknowledges the Supreme Court's *Conover* decision, it asserts that *Conover* "speaks only to the premise that the original petitioners of an annexation petition may withdraw their consent to annexation prior to action by the responsible government" and contends that *Conover* does not constitute any "authority for allowing subsequent purchasers within the area proposed for annexation to withdraw their consent." In essence, Defendant appears to argue that, if property changes hands after the owner has signed an annexation petition, the new owner may not withdraw his or her consent to the annexation petition. A careful review of *Conover* provides no support for this position, since the Supreme Court's decision never makes or relies upon a distinction of the type contended for by Defendant. Thus, Defendant's argument that *Conover* does not afford current property owners the right to withdraw their consent to a voluntary annexation petition signed by a prior owner lacks merit.

Defendant attempts to bolster its argument that late-stage withdrawals from voluntary annexation petitions are inconsistent with the controlling statutory provisions by citing *Kansas City So. Ry. Co. v. City of Shreveport*, 354 So.2d 1362, *cert. denied*, 439 U.S. 829, 58 L. Ed. 2d 122, 99 S. Ct. 103 (1978). In *Kansas City*, the Supreme Court of Kansas held that various individuals who sought to withdraw their consent to a proposed voluntary annexation after the municipality had taken steps to provide municipal services in the affected area were not entitled to do so, stating that:

> "The purpose of such a [voluntary annexation] statute could readily be thwarted by a few people opposed to the proposition presented, by inducing a sufficient number of signers to withdraw their names from the petition and thus take the matter out of the hands of the governing body where they had been satisfied to place it before and had permitted favorable action to be taken."

*Kansas City*, 354 So.2d at 1367 (quoting *Barbe v. City of Lake Charles*, 216 La. 871, 901, 45 So.2d 62, 72 (1949)). However, *Conover* clearly establishes that the Supreme Court was aware of and not concerned by the problem upon which the Supreme Court of Kansas relied:

> [T]he statute providing for voluntary annexation requires the signatures of one hundred per cent of the owners of real property in the area proposed to be annexed. One or more unwilling property owners are in a position, thereby, to thwart the aspirations of the majority in a given area who seek voluntary annexation. . . . [T]he legislature intended voluntary annexation to be accomplished only upon unanimous consent. Absent statutory prohibition on the right to withdraw from a voluntary annexation petition after it has been submitted but final action has not yet been taken on it, we think the considerations articulated in *Idol* support the right of individual petitioners to reconsider their initial decision and withdraw from the petition at any time before final action thereupon.

*Conover* at 516-17, 256 S.E.2d at 223. At bottom, Defendant's argument in reliance on N.C. Gen. Stat. § 160A-31 amounts to a contention that the voluntary annexation process will become unworkable unless limitations upon the ability of individual property owners to withdraw their consents to annexation are created. However, no such limitations appear in the existing statutory provisions relating to voluntary annexations, and the creation of such limitations is a matter for the General Assembly rather than the judicial branch. As a result,

we are unable to find support for Defendant's position in N.C. Gen. Stat. § 160A-31.

### 3. N.C. Gen. Stat. § 160A-314(a)

[3] Thirdly, in reliance on N.C. Gen. Stat. § 160A-314(a), Defendant contends that it "is statutorily authorized to require annexation as a term of its extension of utility services" and asserts that "[a] city may fix the terms upon which the service may be rendered and its facilities used." Although N.C. Gen. Stat. § 160A-314 authorizes municipalities "to establish and revise from time to time schedules of rents, rates, fees, charges, and penalties for the use of or the services furnished by any public enterprise," it does not address the imposition of conditions such as those posited by Defendant. The numerous cases cited in Defendant's brief, such as *Fulghum v. Selma and Griffis v. Selma*, 238 N.C. 100, 104-05, 76 S.E.2d 368, 371 (1953), *Construction Co. v. Raleigh*, 230 N.C. 365, 368-69, 53 S.E.2d 165, 168 (1949), and *Town of Spring Hope v. Bissette*, 53 N.C. App. 210, 212-13, 280 S.E.2d 490, 492 (1981), *aff'd*, 305 N.C. 248, 287 S.E.2d 851 (1982), address a municipality's right to establish rates for extraterritorial service and make no reference to any right that a municipality may possess to condition the provision of water and sewer service on a customer's consent to be voluntarily annexed. Even if a municipality has the authority to condition the provision of water and sewer service upon the customer's agreement to support annexation of the area served, the record contains no indication that Defendant did so at the time that it connected any individual customer residing in the affected developments to its water and sewer facilities. As a result, none of Defendant's arguments in reliance upon various statutory provisions have merit.

### D. Utility Agreements as Real Covenants

[4] Secondly, Defendant argues that the trial court erred by granting summary judgment in favor of Plaintiffs on the grounds that the utility agreements constitute "enforceable covenants that run with the land." According to Defendant, the utility agreements satisfy the conditions required for real, rather than personal, covenants and are, for that reason, enforceable against subsequent purchasers. We do not believe that this argument has merit.

"A restrictive covenant is defined as a 'private agreement, usually in a deed or lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put.' " *Wal-Mart Stores, Inc. v. Ingles Mkts., Inc.*, 158 N.C. App. 414, 420, 581 S.E.2d 111, 116

(2003) (quoting *Hutchens v. Bella Vista Village Prop. Owners Assn., Inc.*, 82 Ark. App. 28, 35, 110 S.W.3d 325, 329 (2003)). Covenants may be categorized as either real or personal:

> Covenants that run with the land are real as distinguished from personal covenants that do not run with the land. . . . Three essential requirements must concur to create a real covenant: (1) the intent of the parties as can be determined from the instruments of record; (2) the covenant must be so closely connected with the real property that it touches and concerns the land; and, (3) there must be privity of estate between the parties to the covenant.

*Raintree Corp. v. Rowe*, 38 N.C. App. 664, 669, 248 S.E. 2d 904, 907-08 (1978). "We adhere ·to the rule that a party seeking to enforce a covenant as one running with the land at law must show the presence of both horizontal and vertical privity. In order to show horizontal privity, it is only necessary that a party seeking to enforce the covenant show that there was some 'connection of interest' between the original covenanting parties, such as, here, the conveyance of an estate in land." *Runyon*, 331 N.C. at 303, 416 S.E.2d at 184-85 (citing Restatement of Property § 534 (1944)). The Restatement of Property, which the Supreme Court quoted in *Runyon*, specifically states with respect to the "connection of interest" issue that:

> The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless
>
> (a)  the transaction of which the promise is a part includes a (a) transfer of an interest either in the land benefited by or in the land burdened by the performance of the promise; or
>
> (b)  the promise is made in the adjustment of the mutual relation ships arising out of the existence of an easement held by one of the parties to the promise in the land of the other.

The agreements between the City and the original developers were clearly not executed in connection with the transfer· of real property. Defendant contends, however, that, "[i]n the present case, horizontal privity arose when the Agreements between [Defendant] and the Developers were made in connection with zoning vested rights, as well as rights-of-way and easements required for Greensboro to maintain the utilities installed in the Developments." Defendant does not, however, cite any record support for this assertion, and we have found none. The utility agreements explicitly state

that vested zoning rights have not been established with respect to the affected properties. Although Defendant contends that, "[a]s exemplified in a plat included as part of the Plaintiffs' own exhibits to their complaint, the [utility agreements] also included property interests to [Defendant], namely rights of way and easements for water, sewer, roads and drainage," the page to which Defendant makes reference is a copy of a preliminary plat for one of the three subdivisions covered by these agreements. Defendant has not explained how this preliminary plat could effectively create or transfer property rights in the development covered by that plat, much less in two developments not depicted on that document. On the contrary, counsel for Defendant candidly conceded during oral argument that the record did not reveal the existence of any easements in the affected developments and stated instead that it was "common knowledge" that such easements were necessary in order for Defendant to provide water and sewer utility service. As a result of the fact that appellate review is conducted on the basis of the information contained in the record developed before the trial court and not on the basis of "common knowledge," *Vassey v. Burch*, 301 N.C. 68, 74, 269 S.E.2d 137, 141 (1980) ("It is axiomatic that . . . appellate courts in this State are bound by the record as certified and can judicially know only what appears of record."), we conclude that Defendant has failed to identify any record evidence tending to show that rights of way, easements, or other property rights were created or transferred in connection with the utility agreements. Thus, we further conclude that Defendant has failed to show the existence of horizontal privity, a necessary prerequisite for the creation of a valid and enforceable real covenant, so that Defendant's argument that the utility agreements constituted enforceable real covenants that run with the land and bind current property owners is without merit.

### E. Equitable Servitude

[5] Finally, Defendant argues that the non-withdrawal provisions of the utility agreements "are alternatively enforceable as equitable servitudes" in reliance on the Supreme Court's decision in *Runyon*, 331 N.C. at 309, 416 S.E.2d at 188. However, this Court has explicitly stated that:

> Plaintiffs also contend that the doctrine of implied equitable servitudes applies in this case. Under that doctrine, the owners of lots in a subdivision in which most of the lots were conveyed subject to common restrictions, may impose those restrictions

against persons whose deeds did not include such restrictions, but who were on notice that such restrictions applied to the lots in the subdivision. We have not adopted the doctrine of implied equitable servitudes in North Carolina, although our Supreme Court has recognized that when an owner of a tract of land subdivides it and conveys distinct parcels to separate grantees, imposing common restrictions upon the use of each parcel pursuant to a general plan of development, the restrictions may be enforced by any grantee against . . . any purchaser who takes land in the tract with notice of the restrictions.

*Harry v. Crescent Resources, Inc.*, 136 N.C. App. 71, 80-81, 523 S.E.2d 118, 124 (1999) (emphasis added) (citation omitted). Defendant has made no attempt to distinguish *Harry* from the factual situation at issue here, and we see no valid basis for making such a distinction. According to well-established North Carolina law, "[w]here one panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). As a result, Defendant's final challenge to the trial court's order is also without merit.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that Plaintiffs were not barred from withdrawing their consent to the annexation petitions at issue here. "Having concluded that the withdrawals were valid, we now must consider what legal effect those withdrawals have on the . . . annexation ordinance adopted [21 April 2009.] The superior court ruled that the entire ordinance was void, and with this ruling we agree." *Conover* at 518, 256 S.E.2d at 224. As a result, we conclude the trial court properly granted summary judgment in favor of Plaintiffs and that its order should be affirmed.

AFFIRMED.

Chief Judge MARTIN and Judge McGEE concur.