The Honorable Donna Hutchinson State Representative
24 Rillington Drive Bella Vista, Arkansas 72714-3204
Dear Representative Hutchinson:
I am writing in response to your request for my opinion on the following questions:
 1. Should a POA water system follow the same rules and regulations concerning a public water system — especially laws governing shutoff issues?
 2. Does the POA have legal standing to shut off water when the resident has paid their water bill but not their monthly POA fee?
 3. If an elected member of the POA Board refuses to sign a confidentiality promise, can he still serve on the Board?
 4. If a POA executive committee meeting was held in confidence, can the POA Board members vote at a later date to make it public?
 5. Can the POA Board change the rules of the Declaration and Protective Covenants with just a vote of the Board members and not a vote of the property owners? *Page 2 
 6. If a Board member was forced to resign and was told that disclosing the reasons for the forced resignation would result in he or she [sic] being sued, would this violate the former Board member's First Amendment rights?
Your questions relate to the operations of the Bella Vista Property Owners' Association (the "POA").
RESPONSE
With respect to all of your questions, subject to certain statutory restrictions, the POA's charter documents will control. Given that the POA is a private nonprofit corporation and that I am barred from engaging in the private practice of law, I must advise that you refer your questions to private counsel or, possibly, to the Bella Vista city attorney.
Question 1: Should a POA water system follow thesame rules and regulations concerning a public watersystem — especially laws governing shutoff issues?
I must note initially that I am statutorily barred from engaging in the private practice of law.[1] It is my understanding that the Bella Vista POA is a private nonprofit corporation, [2] whose transactions with its members are thus beyond the *Page 3 
scope of my authority to assess. Any questions regarding the propriety of the POA's practices should accordingly be addressed to private counsel.
I can opine, however, that a private POA water system is obliged to follow the rules and regulations set forth in its charter documents. Although I have been provided copies of the Bella Vista Village Declaration and Protective Covenants as well as the Bella Vista Village Bylaws, I am not authorized to interpret their application in the present case. I am unaware of whether the POA has contracted with the City of Bella Vista to provide water services to the city's citizens, and I would be unauthorized to opine on the scope of that contract even if I knew its terms. Again, I must stress that the contractual obligations of a private entity should be discussed with private counsel and, to the extent that the contract involves a municipality, with the city attorney.
Question 2: Does the POA have legal standing to shut offwater when the resident has paid their water bill but not theirmonthly POA fee?
The POA's legal standing to terminate a service is purely a matter of contract. I am unauthorized to address whether a private party has contractually agreed to tie the provision of a service to the payment of a fee for another service.
Your question differs from the obverse question of whether amunicipality providing water services might shut off such services because a customer had failed to pay for a related service. I addressed this issue in some detail in the attached Op. Att'y Gen. 2008-028, focusing upon a municipality's police power to discontinue one service because of a citizen's failure to pay for a related service. A private entity such as the POA is not invested with the police power governmental units may exercise. A failure to pay dues to a private organization may justify that organization's refusal to provide water services if a contract so dictates. I am not in a position, however, to determine whether such is the case in this instance. *Page 4 
Question 3: If an elected member of the POA Board refuses tosign a confidentiality promise, can he still serve on theBoard?
Given my lack of knowledge of the attendant circumstances, I cannot determine what the term "confidentiality promise" denotes. In light of the private status of the POA, it is conceivable that Board membership might be conditioned upon a Board member's not publicizing the content of certain Board deliberations.[3] The conditions of Board membership are determined by the POA's charter documents, which the members of the POA presumably approved. Not being a private attorney, I am unauthorized to opine regarding the legal effect of those documents.
Question 4: If a POA executive committee meeting was held inconfidence, can the POA Board members vote at a later date to makeit public?
Subject to the possible application of the Freedom of Information Act, [4] the authority of the POA Board to publicize its deliberations — or, for that matter, to change its mind regarding whether to publicize its deliberations — is purely a function of what powers the Board has been afforded in the charter documents approved by the POA's members. Determining the scope of those powers is a task to be addressed by a finder of fact, which I am not authorized to do in my capacity as an issuer of formal opinions. *Page 5 
Question 5: Can the POA Board change the rules of theDeclaration and Protective Covenants with just a vote of the Boardmembers and not a vote of the property owners?
Again, the POA's charter documents will control in resolving this question. I am unaware of any provision of state law that would preclude the POA from authorizing the Board to change the provisions of the Declaration and Protective Covenants without an approving vote of the POA membership. Any such change, however, obviously could not compromise contractual rights, such as rights of property ownership or access to common amenities, that have vested in individual members of the POA. For the reasons expressed above, I cannot address the factual question of whether the Board has been charged with such authority.
Question 6: If a Board member was forced to resign and wastold that disclosing the reasons for the forced resignation wouldresult in he or she [sic] being sued, would this violate the formerBoard member's First Amendment rights?
Given that the POA is a private organization, any threat by the Board to file suit if a Board member elected to speak on any topic would not implicate the First Amendment, which involves only governmental regulation of speech.[5] Again, any suppression of speech under the circumstances you have recited would be subject only to the law of contracts. Nothing would preclude a Board member from agreeing to maintain silence on any given issue as a condition of his or her membership, and nothing would preclude the Board, on behalf of the POA, from suing for the violation of this condition, although it is difficult to envision what remedy would lie. Conversely, nothing would preclude an unjustly sued Board member from seeking judicial relief in the form of an action for abuse of process or malicious prosecution. *Page 6 
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] A.C.A. § 25-16-701.
[2] The Arkansas Court of Appeals has offered the following summation of the Bella Vista POA's operations:
 Bella Vista Village is a planned residential and commercial community that was formed in 1965. In accordance with the terms of the Bella Vista Declaration, the . . . Bella Vista Village Property Owners' Association (POA), was established to manage the affairs of Bella Vista Village. Every Bella Vista property owner is a member of the POA, and their property is subject to the declaration.
Hutchens v. Bella Vista Village Property Owners' Ass'n,82 Ark. App. 28, 31, 110 S.W.3d 325 (2003). The court has further offered the following summary:
 Bella Vista Village, originally incorporated as the Bella Vista Country Club, is a nonprofit corporation organized under the laws of the State of Arkansas. It is a recreational retirement community developed by Cooper Communities, Inc., formerly known as Cherokee Village Development Company, Inc., consisting of approximately 37,000 lots or living units, approximately 4,000 of which are improved. The POA owns and operates recreational facilities consisting of golf courses, swimming pools, tennis courts, clubs and restaurants, among other facilities and common properties. The POA also provides water and sewer facilities, fire protection, emergency services, and police protection through the Benton County Sheriff's Office.
Morris v. Medin, 43 Ark. App. 29, 30, 858 S.W.2d 142 (1993). Bella Vista was reportedly incorporated in November 2006 and is currently a city of the first class.
[3] I should note, however, that the Board's activities might be subject to disclosure under the Freedom of Information Act if the POA receives direct public funding and its activities are intertwined with public services that the city itself might normally provide. See Op. Att'y Gen. No. 2007-192 (discussing the possible application of the FOIA to a private nonprofit corporation receiving public funds). With respect to the "intertwining" issue, as my predecessor observed in Op. Att'y Gen. No. 2007-227:
 Although it is unclear just how "intertwined" a private entity must be with the government before the FOIA will be deemed applicable, it bears noting, given your constituent's statement that the POA is selling water to the City, that the Arkansas Court of Appeals has identified "water service" as "a service routinely provided by government." Waterworks v. Kristen Investment Properties, 72 Ark. App. 37, 42, 32 S.W.3d 60 (2000).
In my opinion, any potential POA Board membership condition of confidentiality would be subject to this qualification.
[4] See note 3, supra.
[5] As the Supreme Court noted in Central HardwareCo. v. N.L.R.B., 407 U.S. 539, 547 (1972):
 Before an owner of private property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use. The First and Fourteenth Amendments are limitations on state action, not on action by the owner of private property used only for private purposes.